(C.D. 2388)

STANDARD MILLING CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided March 27, 1963)

*John D. Rode* (*Ellsworth F. Qualey* of counsel) for the plaintiff.
*John W. Douglas*, Acting Assistant Attorney General (*Sheila N. Ziff* and
*Harold L. Grossman*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Included in an importation from England are three items, described on the commercial invoice accompanying the entry herein as "1 Set Fittings for Aluminium Spouting," "45—Aluminium Alloy Bends," and "1 Set Pneumatic Exhaust Trunking," the classification of which for tariff purposes is controverted by the plaintiff. Said items were classified by the collector of customs as manufactures of aluminum, not specially provided for, in paragraph 397 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 397), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and duty was imposed thereon at the rate of 20 per centum ad valorem.

Plaintiff contends that said articles, consisting of parts of a pneumatic conveying system used in a rye mill, should properly have been classified as parts of food grinding machines or of food preparing machines within the provisions of paragraph 372 of said act (19 U.S.C. § 1001, par. 372), as modified by the sixth protocol, *supra*, or by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and dutiable at the lower applicable rate therein provided.

The competing provisions of the statutes are here set forth:

Paragraph 397 of the Tariff Act of 1930, as modified by the sixth protocol, *supra:*

Articles or wares not specially provided for, whether partly or wholly manufactured:

```
 * * * * * * *
```
Composed wholly or in chief value of
* * * aluminum * * * _____20% ad val.

Paragraph 372 of said act, as modified by the sixth protocol, *supra:*

Machines, finished or unfinished, not specially provided for:
 Adding machines
 Accounting machines * * * food grinding
 or cutting machines; * * *_____13½% ad val.

 * * * * * * *

 Other (except food preparing and
 manufacturing machinery; * * *)_____ 12% ad val.
Parts, not specially provided for, wholly or in chief value of metal or porcelain,
 of any article provided for in any item in this Part_____ The rate for
 the article
 of which they
 are parts.

Paragraph 372 of said act, as modified by the Torquay protocol, *supra:*

Machines, finished or unfinished, not specially provided for:
 Calculating machines * * *

 * * * * * * *

 Other (except the following:
 accounting machines; * * * food cutting or
 grinding machines; * * *)_____ 13¾% ad val.
Parts, not specially provided for, wholly or in chief value of metal or porcelain,
 of any article provided for in any item 372 in this Part:
 Parts of sewing machines * * *
 Other_____ The rate for
 the article
 of which they
 are parts.

The record upon which this case was submitted to the court for decision consists of the testimony of one witness each for the plaintiff and for the defendant, together with a blueprint, in evidence as plaintiff's exhibit 1, and two pamphlets, which are in evidence as defendant's exhibits A and B.

Anthony J. Kapsiak, plant manager of the flour milling plant in Buffalo of the Standard Milling Co., ultimate consignee of the instant merchandise, was the witness who testified on behalf of plaintiff. He stated that, as plant manager for the past 12 years, he is in charge of the purchasing of grains and of the administration, labor relations, and engineering at the plant. The witness explained that, in 1958, milling engineers from the Minneapolis office of Simon, Ltd., at Cheadle Heath, England, came to Buffalo and after making a study designed a complete rye mill, blueprinted it, and then manufactured all of the various component parts to make up the complete system. The aluminum spouting, bends, and the pneumatic exhaust trunking in controversy are parts of this material.

Describing the operation of the rye mill, witness Kapsiak stated that after the grain is cleaned and prepared for milling, it starts a

"chain reaction of grinding, sifting, separating, grinding, sifting, and so forth, until the final result is rye flour on the one hand, and rye feed as a by-product of it." In order to process the grain in this manner, a conveying system is necessary. An engineering blueprint (plaintiff's exhibit 1) was identified by Kapsiak as showing the method, installation, and operation of the rye mill as it is functioning today. He testified that the blueprint shows the complete operation, beginning with the grinding of the grain to the completion of the process. In compliance with instructions, the witness Kapsiak marked on the blueprint the items in issue, the letter "A" identifying the fittings for aluminum spouting, the letter "B" the aluminum alloy bends, and the letter "C" the pneumatic exhaust trunking.

With the blueprint before him, Kapsiak was asked to describe the operation of the mill, with specific reference to the position and function of the tubing, bends, and exhaust trunking presently before the court, to which he replied—

* * * The grain comes down to the first roller mill, and is beginning to get the initial grinding. The material then falls below the roller, and is picked up by the first pneumatic line, and it is then carried up to the top floor, and discharged into a cyclone, which then separates the material from the air. The air is discharged into a filter. The material goes down to a sifter, goes down below that to an impact machine, and goes into what we call entoleters, which are high speed machines doing another part of the processing. It then goes down to the second roller mill. It's a slow, gradual reduction of the rye grain, you see, that takes place, and that is repeated by the material then going into another pneumatic tube, again being taken up to the ninth floor, discharged into another cyclone, so that finally you have a continuing circle going on involving the sixteen pneumatic lines being full, all the roller mills being full, all of the sifters being full, because it's a continuous process.

It was Kapsiak's testimony that the "aluminum tubes, and bends, and so forth" are basically of five different sizes which are engineered specially to handle certain weighted quantities of material with certain weighted quantities of air, in order to have the pneumatic system operate efficiently without choking. The air pressure in the aluminum tubes, bends, and exhaust trunking is provided by two specially built fans, one a high-pressure fan and the other a low-pressure. The high-pressure fan provides air for all of the different tubes. The low-pressure fan, at the top of the system, separates the air from the material when the material is discharged into a cyclone, at which time the low-pressure fan directs the air into a filter through the trunking.

When asked whether parts like those in issue were used in any other mill, the witness answered that they were, but that they are specifically engineered to a particular system. The rye mill was specifically designed and engineered for operation with a pneumatic system of conveyance.

When asked, on cross-examination, whether the merchandise in controversy performs any operation on the rye or the flour itself, the witness replied, "It only carries the materials." When asked if there are other methods of conveying rye grain as it is being made into flour, the witness replied, "There are bucket elevators."

A. Arthur Smith, president of the Adam Metal Supply, Inc., aluminum distributor, was called to testify on behalf of defendant. Smith stated that his company distributes aluminum sheets, tubes, bars, welding fittings, and weldings of all kinds; that he has been in this business for 30 years and sells his products mostly in the Metropolitan area, but the material is sold all over the world. His company stocks all sizes of pipes and tubing which are sold for various purposes and, in addition to the stock sizes, special sizes are ordered every day.

When shown the specifications for the tubing and fittings in issue, Smith stated that he is familiar with articles of those sizes and shapes; that he has sold similar tubes to chemical installations, structural installations, and electrical installations for use in erection systems, and to the Atomic Energy Commission for hydraulic systems. Based upon his 30 years' experience and knowledge of the uses to which the tubes and bends are put, he testified that they have a greatly diversified use and perform various functions. Received in evidence as defendant's exhibit A was a catalog of the Adam Metal Supply, Inc., aluminum pipe, tubing, and various other shapes which are carried in stock at all times. In addition to the items listed, any size pipe, tubing, or shape may be ordered. The particular size tubes and bends in issue are not listed in the catalog in evidence (defendant's exhibit A), because they are sizes that would have to be ordered specially from the mill, not that they are unusual sizes, but they are one-sixteenth to one-quarter of an inch away from standard stock sizes.

A pamphlet, entitled "Simon Metal Spouting, for mill and screen-room," was received in evidence as defendant's exhibit B.

Smith testified, on cross-examination, that the various sizes specified in the instant invoices would not indicate to him that the articles in issue were ordered for a particular installation.

Based on the knowledge acquired on the uses of bends and tubes of the dimensions in issue, when asked in what type of mill or machine they would be chiefly used, the witness replied that the uses are very diverse; they are used structurally, for strength, for racks; they are used electrically, for conducting electricity; they are used in piping systems, to convey fluids and mill products; and they are used architecturally in buildings. There are so many diverse uses for aluminum that it would be very difficult to say what its principal use would be.

In arriving at a determination of the issue presented by the instant protest, consideration must be given to the following points:

1. Are the spouting, bends, and exhaust trucking in controversy parts in a tariff sense of the articles to which they are joined and with which they are used?

2. Is a rye mill a machine?

3. If so, is it to be classified as a food grinding or cutting machine or as a food preparing and manufacturing machine?

From the evidence offered in this case, it would appear that the spouting, bends, and exhaust trunking were specifically designed, blueprinted, and manufactured for the sole purpose of installation in a particular rye mill which was subsequently installed at the flour milling plant in Buffalo of the Standard Milling Co., plaintiff herein.

In their design and production, the tubes, bends, and trunking in issue were engineered specially to handle certain weighted quantities of material with certain weighted quantities of air in order to have the pneumatic system operate efficiently without choking. It is for this reason that stock sizes could not be ordered and used and that these parts had to be the subject of a special order and of a specific manufacture. From the testimony of plaintiff's witness, it would appear that whereas a pneumatic system of conveying materials in a mill has many applications, it is also apparent that each such pneumatic system must be specially designed and manufactured to perform the particular function to which it will be put.

In the testimony of plaintiff's witness, reference was made to bucket elevators as another method of conveying rye grain during the process of manufacturing flour therefrom, but it was pointed out that the rye mill with which the imported articles were to be joined was specially designed and engineered for operation with a pneumatic system of conveyance.

In the case of *United States* v. *Cody Manufacturing Co., Inc., Rohner Gehrig & Co., Inc.*, 44 CCPA 67, C.A.D. 639, referred to in the brief of plaintiff, the question of what constitutes a "part" of an article within the meaning of the tariff statute was reviewed by our appellate court. After outlining a number of judicial precedents on the subject, the court made the following observation:

The forgoing authorities are uniform in applying the rule that an element which is not essential to the operation of an article for its intended purpose is not a part of that article.

Further, it was stated:

* * * the determining fact is not whether the alleged part can be used without the article, but whether the article can be used for its intended purpose without that part. * * *

Applying the test of the *Cody* case to the tubing, bends, and the pneumatic exhaust trunking in controversy, we are of the opinion that said articles consist of constituent, essential, and component parts of the rye mill with which they are incorporated, and we are led to

the conclusion that said articles are parts of the rye mill for tariff purposes, inasmuch as, according to the record before us, said mill can not be used for its intended purpose without the parts in issue.

Directing our attention now to the second point presented, namely, is a rye mill a machine, we make reference to certain cases cited by the plaintiff in its brief.

*John A. Steer & Co.* v. *United States*, 24 CCPA 293, T.D. 48737, involved several shipments of goods which comprised, when assembled, a complete anhydrous ammonia plant. The collector of customs classified the importations as an entirety within the provisions of paragraph 353 of the Tariff Act of 1930, and plaintiff contended that classification should have been made as a machine, not specially provided for, in paragraph 372 of said act. The imported articles were constructed into a liquid anhydrous ammonia plant, large and extensive in size, and included machinery of various kinds. The imported merchandise consisted of compressors, heaters, tanks, condensers, and refrigerators. In that case, the court held "There can be no question, under the authorities, but that the apparatus is a machine, within the purview of said paragraph 372. *United States* v. *Van Bourgondien Bros.*, 16 Ct. Cust. Appls. 420, T.D. 43135; *United States* v. *Sheldon & Co.*, 15 Ct. Cust. Appls. 308 T.D. 42484; *United States* v. *G. W. Sheldon & Co.*, 21 C.C.P.A. (Customs) 392, T.D. 46913."

In *United States* v. *Van Bourgondien Bros.*, *supra*, certain metal sterilizers, designed and used for sterilizing flower bulbs, were classified as manufactures of metal in paragraph 399 of the Tariff Act of 1922 and claimed to be a machine within the purview of paragraph 372 of said act. The articles imported consisted of a steam boiler, a large vat containing a metal coil, and a lead, to which were attached four regulating valves extending from the boiler to the coil in the vat. Our appellate court held the metal sterilizing apparatus to be a machine in the tariff sense and affirmed the judgment of the court below.

*United States* v. *Sheldon*, *supra*, involved the classification of a metal condenser and pipes, pipe fittings, coils, valves, pan, and malleable iron castings. It was claimed by plaintiff therein that the condenser with its fittings was a machine or a part thereof within the provision of paragraph 372 of the Tariff Act of 1922. The court there found that the condenser, although a complete article, could not be used by itself, and in order to make a complete machine, the condenser must be connected with a compressor. It was there held that even though the condenser and its parts did not constitute by themselves a machine, they were parts of a machine for condensing ammonia gas and were, consequently, dutiable as parts of machines in paragraph 372, as held by the court below.

In the case of *United States* v. *G. W. Sheldon, supra,* certain high-pressure valves, needle valves, and valve extension rods were classified as manufactures of metal in paragraph 397 of the Tariff Act of 1930 and were held to be properly classifiable as parts of machines, not specially provided for, in paragraph 372 of said act. The imported articles were specially designed for use in and as parts of a complicated machine which manufactured or produced synthetic anhydrous ammonia. The proof was positive that the imported merchandise was particularly designed for use in a particular machine which was put into actual commercial use. The court also found that the evidence was clear not only that the imported articles were parts of a particular machine, although imported separately from the machine, but that they were necessary and essential parts for the completion of the machine and that said machines could not function as such without said parts.

Upon a consideration of the above-cited cases, and others of like import, we are led to the conclusion that the rye mill with which the articles here in issue are to be used in its functions of grinding, sifting, separating, and so forth, of rye grain through various repeated processes in order to produce rye flour as a desired end product and rye feed as a byproduct, constitutes a machine within the purview of paragraph 372 of the tariff act.

The third of the points raised by the present controversy is whether a rye mill, such as the one with which the imported articles are used, constitutes a food grinding or cutting machine, or a food preparing or manufacturing machine. Both machines are provided for in paragraph 372 of the Tariff Act of 1930, but within different modifications of the act and at different rates of duty.

From the evidence presented in this case, it appears that, in the course of the mill's operation, various processes are performed in addition to the mere grinding of grain, such processes consisting of sifting, separating, and so forth. It is, therefore, more than a grinding machine and falls within the broader provision for machines for food preparing or manufacturing.

This view finds support in the Summaries of Tariff Information, 1948, volume 3, part 4, where, at page 145, in a discussion of various machines encompassed by the provisions of paragraph 372 of the Tariff Act of 1930, the following appears under the caption "FOOD-PREPARING MACHINES AND PARTS":

This summary covers a great variety of machines used in the commercial preparation and manufacture of foods. Among the more important kinds of machinery included are food grinding, cutting, and other food preparing machines used by the milling, canning, dairy, meat-packing, and similar industries, as well as specialized machines used in bakeries and in chocolate and confectionery plants. * * *

It is also significant to note from the record that upon importation of the merchandise covered by the present entry, all of which items were destined for incorporation into the rye mill under construction at the plaintiff's Buffalo plant, one of said items, described on the commercial invoice as "1 Set Pneumatic Conveyor Material consisting of Rotary Air Seals, Floor Tube Supports, Pneumatic Cyclones and Gear Boxes," was classified by the collector as parts of food preparing machines in paragraph 372 of the Tariff Act of 1930, as modified, whereas the balance of the importation was classified as manufactures of aluminum, not specially provided for, within the basket provisions of paragraph 397 of said act, which latter fact gave rise to the instant controversy.

The position of the defendant in this matter can be succinctly stated by quoting the following from the defendant's brief:

It is the Government's contention herein that the aluminum tubings at bar are factually and basically nothing more than general purpose conveyors suitable for use in many types of plants manufacturing, handling and processing many varied and diverse items. * * *

In support of this position, the case of *United States* v. *Hudson Shipping Co., Inc., Barre Footwear Co.*, 49 CCPA 92, C.A.D. 802, is cited. In that case, a conveyor system, consisting essentially of a frame which supported upper and lower tracks over which tote boxes were conveyed either to a selected work station or from any of the work stations, which was installed in a shoe factory, was held not to be a part of shoe machinery in paragraph 1643 of the Tariff Act of 1930. The reasoning of our appellate court in so holding is contained in the following quotation:

A general purpose conveyor does not, in our opinion, lose its identity as such nor become "shoe machinery" merely because it happens to have been installed in a shoe factory. Its function remains that of a conveyor which moves work pieces from place to place within a factory. The identical conveyor with its set up of multiple work stations also can be used in manufacturing many items other than shoes.

We are of the opinion, however, that the *Hudson* case, *supra*, is distinguishable from the case at bar, inasmuch as the conveyor in the *Hudson* case was a general purpose conveyor which could be used in a variety of manufacturing operations, whereas the instant pneumatic system of conveyance was one specifically designed, blueprinted, and manufactured for use with a particular rye mill and was so designed and engineered to handle certain weighted quantities of material with certain weighted quantities of air in order to provide efficient operation in the instant rye mill.

For the foregoing reasons, we are of the opinion that the aluminum spouting, aluminum bands, and pneumatic exhaust trunking in issue, which were classified by the collector of customs as manufactures of

aluminum, not specially provided for, in paragraph 397 of the Tariff Act of 1930, as modified, should properly have been classified as parts of a food preparing machine in paragraph 372 of the Tariff Act of 1930, as modified by the Torquay protocol, *supra*, and subjected to duty at the rate of 13¾ per centum ad valorem. The claim in the protest to that effect is, therefore, sustained. All other claims are overruled.

Judgment will issue accordingly.